UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRAELYN CARY, as Special
Administrator of the Estate of
Christopher L. Cary,

                Plaintiff,

      v.                                     Case No. 19-CV-498

CITY OF FOND DU LAC,
SANDRA O'DONNELL,
and TRENTON SMITH,

                Defendants.

## DECISION AND ORDER

### 1. Procedural History

City of Fond du Lac Police Officer Sandra O'Donnell on December 23, 2018, stopped a vehicle that failed to display a front license plate. (ECF No. 47, ¶ 2.) The driver of that car was Christopher L. Cary. At some point during the traffic stop Cary apparently ingested a large amount of cocaine and died as a result. (ECF No. 47, ¶ 87.)

Cary's estate brought this action alleging that O'Donnell and Fond du Lac Police Officer Trenton Smith violated Cary's rights under the Fourth Amendment by subjecting him to an unreasonable search and seizure. (ECF No. 23, ¶¶ 22-29.) The

plaintiff also alleges that O'Donnell and Smith conspired to deprive Cary of his rights. (ECF No. 23, ¶¶ 37-42.) The parties previously stipulated to the dismissal of other claims and defendants. (ECF Nos. 36, 37, 38.)

The defendants have moved for summary judgment. (ECF No. 39.) The plaintiff has responded, and in doing so agrees to dismiss the conspiracy claim, leaving claims that O'Donnell and Smith violated Cary's rights under the Fourth Amendment by improperly extending the traffic stop and conducting a pat-down of Cary. (ECF No. 46 at 2.) The defendants have replied. (ECF No. 50.) The motion is ready for resolution. All parties have consented to the full jurisdiction of this court. (ECF No. 7, 15.) The court has subject matter jurisdiction under 28 U.S.C. § 1331.

The following facts are taken from the parties' proposed findings of fact. However, the plaintiff in its brief relies on additional facts that it introduced only in response to the defendants' proposed findings of fact, which is improper. *Lanning v. Gateway Tech. Coll.*, No. 19-CV-890, 2020 U.S. Dist. LEXIS 121446, at *1 n.1 (E.D. Wis. July 10, 2020) (citing *Pollock v. ManpowerGroup US, Inc.*, No. 18-CV-107, 2019 U.S. Dist. LEXIS 199665, at *7-8 (E.D. Wis. Nov. 18, 2019)). "Any additional proposed findings of fact must be presented only in accordance with Civ. L.R. 56(b)(2)(B)(ii), which ensures that the moving party is able to appropriately respond to the proposition." *Pollock v. ManpowerGroup US, Inc.*, No. 18-CV-107, 2019 U.S. Dist. LEXIS 199665, at *8 (E.D. Wis. Nov. 18, 2019). Although the plaintiff submitted its own proposed findings of fact, it

generally failed to include the facts it offered only in response to the defendants' proposed findings of fact.

This failure to comply with the court's Local Rules deprived the defendants of the opportunity to respond to those additional proposed findings of fact. Consequently, any factual assertion that is supported only by a citation to the plaintiff's response to the defendants' proposed findings of fact is disregarded for purposes of summary judgment. *See Perkins v. Milwaukee Cnty.*, 781 F. App'x 538, 540 (7th Cir. 2019); *see also Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, ___, 2021 U.S. App. LEXIS 4500, *11-*13 (7th Cir. 2021); *Benuzzi v. Bd. of Educ.*, 647 F.3d 652, 655 (7th Cir. 2011) ("District courts have broad discretion to enforce and require strict compliance with their local rules."). This error, however, does not appear to have impacted the resolution of the defendants' motion.

2. Facts

The encounter between O'Donnell and Cary was recorded by a dashboard camera in O'Donnell's squad car. The defendants have provided the court with that video. According to that video, O'Donnell activated the emergency lights of her squad car and pulled Cary over at 9:31 p.m. (ECF No. 47, ¶ 3.) At 9:32, O'Donnell approached Cary's car, identified herself, and explained the reason for the stop. (ECF No. 47, ¶ 4.) In doing so, O'Donnell noticed that Cary was not wearing a seatbelt. (ECF No. 47, ¶ 5.) O'Donnell asked Cary for his license and proof of insurance. (ECF No. 47, ¶ 6.) Cary

stated he did not have his driver's license or any other form of identification. (ECF No. 47, ¶¶ 7, 8.) He also stated that he did not own the car and did not know if it was insured. (ECF No. 47, ¶¶ 9, 10.) O'Donnell asked Cary for his name and address, which he provided. (ECF No. 47, ¶ 11-13.)

O'Donnell returned to her squad car at about 9:33 p.m. (ECF No. 47, ¶ 18.) In her car, O'Donnell used her mobile computer to verify the license plate and registration of the car. (ECF No. 47, ¶ 19.) Although she confirmed that a person with Cary's name had a valid driver's license, because Cary did not have any identification, she needed to find a photograph of Cary to confirm his identity. (ECF No. 47, ¶¶ 20-22.) Neither the Department of Motor Vehicles nor the Fond du Lac police department's internal databases that O'Donnell checked contained a photograph of Cary. (ECF No. 47, ¶¶ 24, 29-32.) However, these databases revealed that Cary had an extensive criminal history, including "multiple convictions for aggravated assaults, substantial batteries, burglaries, and multiple drug convictions, including trafficking and maintaining drug trafficking locations with narcotics possessions." (ECF No. 47, ¶ 23.) Amidst this review of records, at 9:37 p.m. O'Donnell contacted her dispatcher and asked if a police dog was available. (ECF No. 47, ¶ 27.) The dispatcher informed her that the dog would be available soon. (ECF No. 47, ¶ 28.)

It was not until O'Donnell checked Fond du Lac County Jail records that she found a photograph of Cary and was able to confirm his identity. (ECF No. 47, ¶¶ 33-

36.) After O'Donnell confirmed Cary's identity, she asked her dispatcher to check to see if Cary had any open warrants, criminal cases, or bond conditions. (ECF No. 47, ¶ 38.) About a minute later, at 9:43 p.m., the dispatcher told O'Donnell that Cary had a pending felony drug case and advised O'Donnell of Cary's bond conditions. (ECF No. 47, ¶ 39.)

O'Donnell immediately requested a backup officer (ECF No. 47, ¶ 40) and began preparing a citation for Cary's failure to have insurance (ECF No. 47, ¶ 41). O'Donnell printed the citation at 9:46 p.m. (ECF No. 47, ¶ 42) and moved on to preparing written warnings for failing to display a front license plate and failing to wear a seatbelt (ECF No. 47, ¶ 43).

At about 9:48 p.m., while O'Donnell was preparing the warnings, Fond du Lac Police Officer Trenton Smith arrived as a backup officer. (ECF No. 47, ¶¶ 44-45.) O'Donnell explained to Smith what was going on, and Smith responded that he had recently arrested Cary. (ECF Nos. 47, ¶¶ 47-48; 51, ¶ 3.) Smith explained that Cary's address at that time was not the one that Cary had provided to O'Donnell. (ECF No. 47, ¶ 48.) This discussion about Cary's address and whether providing a false address would constitute the crime of obstructing an officer took over three minutes. (ECF No. 51, ¶¶ 4, 5, 11.) O'Donnell checked Cary's open criminal case and saw that his address in those records also was not the address Cary had provided to O'Donnell. (ECF No. 47, ¶ 50.) At 9:52, Smith went to Cary's car to ask Cary what his current address was. (ECF

5

No. 47, ¶ 51.) About a minute later, Cary confirmed that the address he initially gave to O'Donnell was his current address. (ECF No. 47, ¶ 53.)

At about 9:58 p.m., while O'Donnell was printing off the warnings (ECF No. 47, ¶ 59), Fond du Lac County Sheriff's Deputy Justin Weisbecker arrived with his police dog. (ECF No. 47, ¶ 56.) O'Donnell explained to Weisbecker what was going on (ECF No. 47, ¶ 57), and Weisbecker and Smith went to speak with Cary (ECF No. 47, ¶ 58). At 9:59 p.m., O'Donnell got out of her car, approached Cary's window, and asked Cary to get out of the car so she could explain the citations and warnings to him. (ECF No. 47, ¶ 60.) Cary initially refused, said she could explain them while he stayed in the car, and said that O'Donnell was harassing him. (Video, 21:59:47.) Up until this point Cary had been cooperative. (ECF No. 51, ¶ 17.) O'Donnell responded that she was going to explain them to him on the sidewalk and not in the street with cars driving by. (ECF No. 47, ¶ 61.) After Cary got out of the car and walked to the sidewalk, the police dog immediately began going around Cary's car. (ECF No. 47, ¶ 62.) The dog soon alerted to the presence of drugs in the car. (ECF No. 47, ¶ 68.)

When Cary got out of his car, his hands were in the pockets of his sweatshirt. (ECF No. 47, ¶ 63.) O'Donnell told Cary to keep his hands out of his pockets, and Cary complied. (ECF No. 47, ¶¶ 63-64.) But a few seconds later Cary put his hands back in his pockets, leading O'Donnell to again order him to keep his hands out of his pockets. (ECF No. 47, ¶¶ 64-65.) Again, Cary initially complied, only to put his hands back in his

pockets a few seconds later. (ECF No. 47, ¶ 66.) O'Donnell for the third time told Cary to keep his hands out his pockets. (ECF No. 47, ¶ 67.) Cary again initially complied but then attempted to put his hand back in his pocket, at which point O'Donnell grabbed his hand and ordered him for a fourth time to keep his hands out of his pocket. (ECF No. 47, ¶ 69.)

O'Donnell then conducted a pat-down of Cary. (ECF No. 47. ¶ 70.) During the pat-down O'Donnell felt a firm object in Cary's pocket and asked Cary's permission to remove it. (ECF No. 47, ¶ 71.) Cary consented, and O'Donnell removed a bundle of cash. (ECF No. 47, ¶ 72.) After completing the pat-down, O'Donnell and Weisbecker began to look through Cary's car and discovered a white substance that O'Donnell believed to be crack cocaine and multiple baggies that she believed were consistent with drug trafficking. (ECF No. 47, ¶¶ 76-77.)

### 3. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-

7
Case 2:19-cv-00498-WED   Filed 04/12/21   Page 7 of 19   Document 58

movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

4. Analysis

   a. **Extension of the Stop**

The plaintiff argues that O'Donnell and Smith unlawfully extended the traffic stop in six ways: (1) requesting a police dog; (2) communicating with dispatch about the police dog; (3) talking amongst themselves; (4) talking with Weisbecker; (5) printing two copies of the citation; and (6) ordering Cary to get out of the car. (ECF No. 46 at 4-12.)

There is no dispute that, after O'Donnell observed that the vehicle Cary was driving did not display a front plate, she was authorized to stop it. *See Whren v. United States*, 517 U.S. 806, 810 (1996); Wis. Stat. § 341.15(1); *State v. Houghton*, 2015 WI 79, ¶¶73-78, 364 Wis. 2d 234, 266-67, 868 N.W.2d 143, 159-60. Having lawfully stopped Cary, O'Donnell was authorized to detain him for a reasonable period of time to "address the traffic violation that warranted the stop." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). This typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. O'Donnell was also authorized to

"conduct certain unrelated checks during an otherwise lawful traffic stop" provided she did "not do so in a way that prolongs the stop." *Id*. Any investigation outside the initial mission of the traffic stop that "measurably extend[s] the duration of the stop" must be supported by at least reasonable suspicion of illegal activity. *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

The plaintiff's argument rests on the premise that *anything* that was not strictly related to the reason for the traffic stop, even a delay of a single second, violates the Fourth Amendment. But that argument is inconsistent with well-established principles, most significantly the reasonableness requirement that underlies the Fourth Amendment. *See Riley v. California*, 573 U.S. 373, 381-82 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). The Court of Appeals for the Seventh Circuit, for example, has rejected the notion that a police officer violates the Fourth Amendment by extending a traffic stop with questions unrelated to the traffic stop and not otherwise supported by reasonable suspicion. *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005) ("the police may ask questions that do not concern the purpose of the stop and that are not supported by any other suspicion"); *see also United States v. Lewis*, 920 F.3d 483, 492 (7th Cir. 2019); *United States v. Childs*, 277 F.3d 947, 954 (7th Cir. 2002) (discussing *Ohio v. Robinette*, 519 U.S. 33, 117 S. Ct. 417 (1996)).

"What the Constitution requires is that the entire process remain reasonable." *Childs*, 277 F.3d at 954; *see also State v. Vetter*, 927 N.W.2d 435, 443 (N.D. 2019) ("The Fourth Amendment does not call us to scrutinize traffic stops for unnecessary casual conversation or impose a constitutional mandate for time efficiency over incidental questions or conversation. The hallmark of a Fourth Amendment claim is whether the search or seizure was 'reasonable.'"). It was this principle that is reflected in the Supreme Court's proscription of police conduct that "measurably extend[s] the duration of the stop," *Rodriguez*, 575 U.S. at 355. The Court was not saying that *any* delay that was capable of being measured amounts to a constitutional violation. To use "measurably" in that sense with respect to time would be, at a minimum, redundant; time is inherently capable of measurement. By adding "measurably," it is obvious that the Supreme Court was saying something different than proscribing anything that "extend[s] the duration of the stop." The Court was using "measurably" in the sense of, "[t]o a significant extent; considerably; notably," *see* Oxford Eng. Dict., *OED Online*, available at https://www.oed.com/view/Entry/115504 (last visited April 12, 2021).

Even if O'Donnell could have completed the traffic stop faster than she did, "[t]he reasonableness of a seizure depends on what the police do, not on what they might have done." *Childs*, 277 F.3d at 953; *see also Rodriguez*, 575 U.S. at 357. The actions the plaintiff challenges were either wholly proper and related to the "mission" of the traffic stop, *see Rodriguez*, 575 U.S. at 355, or reasonable as *de minimis* extensions of the

stop, *cf. Mimms*, 434 U.S. at 111 (noting that de minimis intrusions do not violate the Fourth Amendment). "*Rodriguez* does not prohibit all conduct that in any way slows the officer from completing the stop as fast as humanly possible." *United States v. Cortez*, 965 F.3d 827, 837 (10th Cir. 2020), *cert. denied*, 20-6472, 2021 WL 161110 (U.S. Jan. 19, 2021) (quoting *United States v. Campbell*, 912 F.3d 1340, 1353 (11th Cir. 2019), *cert. denied*, 140 S. Ct. 196 (2019), *reh'g denied*, 140 S. Ct. 633 (2019), and opinion vacated and superseded, 970 F.3d 1342 (11th Cir. 2020), *reh'g en banc granted, opinion vacated*, 981 F.3d 1014 (11th Cir. 2020)).

The plaintiff argues that O'Donnell unlawfully extended the traffic stop to communicate with dispatch about the availability of a police dog. There were three separate exchanges between O'Donnell and dispatch about this. The first occurred from 21:37:50 to 21:38:06—that is, it lasted 16 seconds. O'Donnell asked if the police dog was available, her dispatcher said, "No," and O'Donnell acknowledged the response.[1] About a minute later, from 21:39:08 to 21:39:31 (23 seconds), her dispatcher contacted O'Donnell and told her that the police dog would be available soon but would be coming from some distance away (about 10 miles according to Google, *see* Fed. R. Evid. 201(b)(2); the parties failed to provide the court with this detail) and so asked if the dog was still needed. O'Donnell responded that it would probably take too long for the dog

---

[1]  O'Donnell: City 42. Is County 64 available?
    Dispatch: 42. Negative.
    O'Donnell: 10-4.

to get to where she was.[2] And finally, from 21:46:30 to 21:46:51 (another 21 seconds), the dispatcher told O'Donnell that the police dog was available and asked if he should come to her traffic stop. O'Donnell stated that he can and that he might make if before she finishes the stop.[3] In total, these three conversations lasted one minute.

The plaintiff has not presented any authority supporting the view that, by simply requesting a police dog without reasonable suspicion that a vehicle contained drugs, a police officer diverts from the mission of the stop and thus violates the constitution. If such action violated the constitution, it would be remarkable that no court has so held given that such nominal delays undoubtedly occur routinely. *Cf. United States v. Guidry*, 817 F.3d 997, 1001, 1005 (7th Cir. 2016) (noting without comment that a police officer had to call for a police dog to come to a traffic stop and holding that the officer did not impermissibly extend the traffic stop); *United States v. Offord*, 788 F. App'x 384, 385 (7th Cir. 2019) (noting without comment that an officer "radioed for a canine unit" and later holding that the officer did not impermissibly extend the traffic stop).

---

[2] Dispatch: 42?
O'Donnell: Go ahead.
Dispatch: County 64 said he'll be clearing shortly but said he'll be responding from the B & B Express in Mount Calvary.
O'Donnell: 10-4. Yeah, it's probably going to be too much of a delay.
Dispatch: Copy.

[3] Dispatch: 42?
O'Donnell: Go ahead.
Dispatch: County 64 is clear. Did you want him to head your way or no?
O'Donnell: Yeah, why don't you have him go and start to head this way. Maybe he'll make it before we finish up.
Dispatch: Copy.

The lack of comment is understandable. Given that it is well-established that a police officer can nominally extend a traffic stop by asking questions unrelated to the purpose of the stop, *Lewis*, 920 F.3d at 492, she certainly can nominally extend a traffic stop by requesting a police dog to conduct a suspicionless search. Because any communication would presumably cause some delay, the plaintiff's argument would amount to a requirement that a police officer have at least reasonable suspicion of drug activity before she could request a police dog to come to a traffic stop. But this is not the law. *See, e.g., United States v. Holt*, 777 F.3d 1234, 1257 (11th Cir. 2015) ("an officer does not need any level of suspicion of criminal activity … to request a canine unit").

As stated above, O'Donnell's three conversations with her dispatcher about the availability of a police dog consumed a total of one minute. Accepting that this one-minute of discussion was a diversion from the "mission" of the stop, and thus no part of these exchanges occurred while O'Donnell was also reviewing records or preparing the citation or warnings (a proposition the defendants dispute), this delay was *de minimis*. The communications did not extend the stop to a considerable or significant extent. *Cf. Rodriguez*, 575 U.S. at 355. Consequently, the stop remained reasonable, and O'Donnell did not violate the Fourth Amendment in requesting a police dog.

The plaintiff also argues that O'Donnell unlawfully extended the traffic stop by requesting backup and talking with Smith when he arrived. But after learning that Cary had pending felony drug charges, it was undoubtedly reasonable for O'Donnell to

13
Case 2:19-cv-00498-WED   Filed 04/12/21   Page 13 of 19   Document 58

request a backup officer for her own safety. *See Rodriguez*, 575 U.S. at 356 ("[T]he government's officer safety interest stems from the mission of the stop itself. Traffic stops are especially fraught with danger to police officers so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." (citations and quotation marks omitted)); *Mimms*, 434 U.S. at 110 (noting that officer safety concerns are "legitimate and weighty"). When Smith arrived, it would be expected that he and O'Donnell would spend some time discussing what was going on. Such a discussion is consistent with the mission of the stop.

That this discussion included determining Cary's proper address and whether providing a false address would be a crime were wholly appropriate and within the mission of the traffic stop. Ensuring an accurate address for a driver would seem like an ordinary part of any traffic stop. But, more materially, O'Donnell explained that, with respect to the written warning regarding the missing front license plate, if Cary did not fix the issue within 10 days, she would need to mail him a citation. She obviously needed his correct address to mail him a citation.

Likewise, it was entirely reasonable that O'Donnell took time to briefly explain to Weisbecker what was going on when he arrived with the police dog. Again, the plaintiff does not point to any authority to support the assertion that it violates the Fourth Amendment for a police officer to brief a backup officer or consult a colleague on how to proceed. To hold that these sorts of communications violate the Fourth Amendment

because they result in an extension of a traffic stop would have radical implications for standard and reasonable police practices, as well as officer safety.

As for any delay that might have resulted from O'Donnell printing two copies of the citation, any such delay was, again, *de minimis*. The plaintiff attempts to make much of the fact that O'Donnell gave two explanations for why she did this—because the citation reprinted when she printed the warnings and because she always makes a second copy when a traffic stop might lead to an arrest. (ECF Nos. 46 at 10-11; 51, ¶ 16.) The fact that there were two explanations does not support the inference that she printed the second copy just to delay the traffic stop so the police dog could arrive. Moreover, as the plaintiff argues in its brief, O'Donnell did not print the second citation until *after* the police dog arrived (ECF No. 46 at 11), and thus there was no reason to delay. At that point, it was clear that the dog would have been able to sniff around the car in the time it would take O'Donnell to explain the citation and warnings to Cary.

Nor was it improper for O'Donnell to have Cary get out of the car so she could explain the citation and warnings to him:

> The hazard of accidental injury from passing traffic to an officer standing on the driver's side of the vehicle may also be appreciable in some situations. Rather than conversing while standing exposed to moving traffic, the officer prudently may prefer to ask the driver of the vehicle to step out of the car and off onto the shoulder of the road where the inquiry may be pursued with greater safety to both.

*Mimms*, 434 U.S. at 110-11. The risk that traffic posed is evident from the video. The stop occurred on a fairly narrow street in a commercial district, and cars were required to

15
Case 2:19-cv-00498-WED   Filed 04/12/21   Page 15 of 19   Document 58

maneuver into oncoming traffic when passing the squad and Cary's car. Even absent a legitimate concern for her safety, O'Donnell could have had Cary get out of the car for no reason whatsoever. *See Lewis*, 920 F.3d at 492 (quoting *United States v. Baker*, 78 F.3d 1241, 1244 (7th Cir. 1996) ("During a valid traffic stop, an officer may 'legitimately ask [a driver] to step out of his car, even without any particularized suspicion ….'"). It is immaterial if the officers' real motivation was to facilitate the dog's work.

Overall, the video reflects O'Donnell diligently pursuing the mission of the traffic stop and proceeding consistent with the constitutional limits. *See Rodriguez*, 575 U.S. at 354 ("in determining the reasonable duration of a stop, 'it [is] appropriate to examine whether the police diligently pursued [the] investigation'") (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). As a matter of law, the stop was of a reasonable length and not unreasonably extended. Therefore, it is unnecessary to assess whether O'Donnell had reasonable suspicion to extend the traffic stop. The defendants are entitled to summary judgment as to this aspect of the plaintiff's claim.

b. **Pat-Down**

"Whenever the circumstances of an on-the-street encounter are such that a police officer reasonably believes he may be dealing with someone who is armed and dangerous, the officer is justified in conducting a pat-down search of that individual for weapons for his own protection, and for that of others nearby." *United States v. Fryer*, 974 F.2d 813, 819 (7th Cir. 1992) (citing *Terry v. Ohio*, 392 U.S. 1, 27, 20 L. Ed. 2d 889, 88 S.

Ct. 1868 (1968)). "[T]he officer must possess specific, articulable facts which, in combination with inferences to be drawn from those facts, reasonably warrant the intrusion." *Id.* (citing *Terry*, 392 U.S. at 21; *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)). Reasonable suspicion is assessed objectively from the perspective of a reasonable police officer; an officer's subjective motives are irrelevant. *United States v. Wanjiku*, 919 F.3d 472, 487 (7th Cir. 2019).

The defendants argue that reasonable suspicion existed to pat down Cary due in large part to the fact that he repeatedly put his hands in his pockets despite being told to keep his hands out of his pockets. The plaintiff relies on *United States v. Williams*, 731 F.3d 678 (7th Cir. 2013), to argue that it is clearly established that a person having his hands in his pockets is not a reason to pat him down. (ECF No. 46 at 25.)

In *United States v. Williams*, 731 F.3d 678 (7th Cir. 2013), a divided panel held that a police officer lacked reasonable suspicion to pat the defendant down for weapons simply because he observed the defendant with his hands in his pockets. *Id.* at 689. While emphasizing that it was not creating a categorical rule, and that there might be circumstances where a person having his hands in his pocket supported reasonable suspicion for a pat-down, the court noted that the defendant had immediately removed his hands when instructed to do so and it was only then that police officer chose to pat him down. *Id.*

Unlike the defendant in *Williams*, after being told to keep his hands out of his pockets Cary put them back in his pockets. *Williams* does not answer the question of whether a person putting his hands back in his pockets immediately after having been told by a police officer to keep his hands out of his pockets is enough to merit a frisk. And the court need not decide that question, because Cary was not frisked until he for a fourth time tried to put his hands back in his pockets after being told to keep them out.

Cary's persistent refusal to keep his hands out of his pockets would lead a reasonable officer to be concerned that he might be armed. In addition, O'Donnell knew that Cary had a significant criminal history, including convictions for violent offenses, and that he was presently on bond for a pending felony drug case. Under these circumstances, it was more than reasonable for O'Donnell to pat Cary down. And, finally, before O'Donnell patted Cary down the police dog alerted to the presence of controlled substances in the car. The connection between weapons and drugs (especially for drug dealers, which O'Donnell knew Cary to be based on his criminal history) is so well-established that it hardly need be stated. *See, e.g.*, *United States v. Hubbard*, 61 F.3d 1261, 1270 (7th Cir. 1995).

Under the totality of the circumstances, a reasonable police officer in O'Donnell's position would have had reasonable suspicion that Cary was armed. Therefore, it was reasonable as a matter of law for her to conduct a pat-down of Cary. Accordingly, the

defendants are also entitled to summary judgment as to the plaintiff's claim that the pat-down violated Cary's rights under the Fourth Amendment.

5. Conclusion

The undisputed facts demonstrate that, as a matter of law, O'Donnell did not unreasonably extend the traffic stop and she had reasonable suspicion to conduct a pat-down of Cary. Accordingly,

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (ECF No. 39) is **granted**. This action is dismissed with prejudice. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the defendants' motion in limine (ECF No. 52) is **dismissed as moot**.

Dated at Milwaukee, Wisconsin this 12th day of April, 2021.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge